May it please the Court, I'm Dana Johnson for Appellants. I'll spend eight minutes discussing the Management Indicator Species Monitoring Issues, and then my co-counsel will spend eight minutes discussing the Bull Trout issues, and we'd like to reserve four minutes for rebuttal, please. All right. Your Honors, with regard to the Management Indicator Species Monitoring Issues, there are two things that I'd like to impress upon the Court today. The first, I think, is the most important given the District Court's decision, and that is that the Forest Service in this case is violating a specific and binding Forest Plan standard for monitoring population levels of Management Indicator Species across the Nez Perce National Forest. This Forest Plan violation on its own is sufficient ground for granting appellants relief in this case. Did you make that argument to the District Court? I thought your argument was project level versus forest level. Well, I think that's the way that the argument was construed by the Court. So this is a new argument? We've always maintained that the violation of the monitoring requirements is something that can preclude authorization of the site-specific project. And so the issue isn't really whether the monitoring is a site-specific project versus, or excuse me, a site-specific requirement versus a forest-wide requirement. It's whether that standard that's in the Forest Plan can preclude the Forest Service's authorization of the site-specific project. And where do I find that argument in your brief? Your Honor, we argued in the brief that regardless of whether this is a Forest Plan, or excuse me, a site-specific argument or a forest-wide argument, that that necessarily impacts the And, Your Honor, if I can take just a second to find that. I've tabbed lots of things, and I did not tab that particular thing. Well, if you can just give me a section of it. Give me the argument heading, and we can look it up. Okay. It's under Plaintiff's Opening Brief, starting at page 17. It's in that section. And I believe we also discussed that in our reply brief. So, starting with the first-level inquiry then, whether the management indicator species really actually is looked at at only a forest level, as the government says, or whether it applies to the project level. It seems to me that's a threshold question that we need to answer, and the government sets out a lot of reasons why it doesn't apply at the best argument as to why the government's wrong on that point. Your Honor, I think this Court's decision in Idaho's Boarding Congress v. Rittenhouse answers that question. And that case makes clear that if a Forest Plan standard is violated, and there's a connection between the site-specific action and that forest-wide standard, then the site-specific action must be enjoined. And so, in this case, whether That's a little bit different than my question to you, because that almost goes to your sub-argument that you started with. And that is, even if it's just the Forest Plan that we're looking at, that the Forest Plan can lead you to violations. So, maybe I think it's a little more nuanced to ask you, is there any support for saying that you look to the project level without as an own, independent basis? Your Honor, I think it might help to look at the way that the Forest Plan, Chapter 2, is organized. And I've supplied all of Chapter 2 to the Court for review. And the way that that is organized is there are forest-wide goals and objectives, and then under subsection E of the Forest Plan, there are standards that the Forest uses to implement those goals and objectives. And under subsection E, there are two standards that are at issue in this case. And one of those is Fish and Wildlife Standard 3, and the other is Fish and Wildlife Standard 7. Fish and Wildlife Standard 3, or let me back up just a moment, Your Honor, both of those fall under the same subsection of the Forest Plan, which is standards. And both of those apply forest-wide, which means that they apply across all areas of the forest and all management areas as well. And both of these are the Forest Plan's enforceable mechanisms for reaching its goals and objectives. And under subsection E, they are listed independently from one another. And so one of those standards cannot be used to satisfy the other. They're two independent standards. Can you give me a specific page reference? What are you looking at? I'm looking at Chapter 2. Yeah, I have it. Can you give me an ER site? Chapter 2 in its entirety was supplied to the Court after the subheadings. I've got it. I'm just asking if you can point me to the specific language that you're talking about. Because frankly, you're making an argument here that I just didn't understand from opening or from either both the opening and the reply. And this is why I'm trying to clarify at this point now, because I think it's an initial matter. Can you give me a page site as opposed to just read the whole chapter? Yes. Chapter 2 at page 15 is where subsection E is found. And what's the ER site? That is not in the ER. That's the subchapter heading that was omitted inadvertently from the ER that says the word standards. So we don't have standards? This argument is really getting fuzzy, Counsel. I'm sorry, but I'm just not tracking you. In the briefing, Your Honor, I cited to both Fish and Wildlife Standard 3 and Fish and Wildlife Standard 7. Where do I find those? And both of those are included in the briefing at... Okay. I'm actually looking for the record. Yes. And just to be clear, Your Honor, both of those were cited in the briefing, and I'll give you the record site right now. Well, we don't want the briefing on a record site. I'm clarifying, Your Honors, that that was included in the briefing in the portion that I submitted afterwards. But not in the record. It is in the records, Your Honor. Where in the record? Which volume of the record are we looking at? I am looking at ER 405 and 406, Your Honor. Okay. That I have. Those were cited. What am I looking at on 405 and 406? 405 and 406 provide the management standards, the forest plan standards that are at issue in this case. Wildlife and Fish Standard 3. I'm looking at Paragraph 3 on ER 405. Is that what we're talking about? Yes, Your Honor. Okay. And on ER 406 is the other standard that is at issue, and that is... What paragraph? Number 7. 7. Provide management for minimum viable populations of old growth and snag-dependent species by adhering to the standards stated in Appendix N. Yes, Your Honor. Okay. And Wildlife and Fish Standard 3 that is on ER 405 is the forest plan standard that requires monitoring population levels of all management indicator species on the forest. Okay. And that one is implemented through Chapter 5 of the forest plan and also Appendix O. Okay. So... These are all talking about the forest plan. That identifies the indicator species. Now, what's the problem here? The problem is that Wildlife and Fish Standard 3, which is a forest plan standard, requires monitoring of population levels of management indicator species. And it defines exactly how that must be done. So the forest plan in this case tells us what is required. All right. Where do I look in the forest plan? And if you look at... I'm sorry, Your Honor. I didn't mean to cut you off. That's okay. Now I go to Chapter 5. Yes. And where in Chapter 5 do I go? If you look at Chapter 5, that provides more specific direction on that particular standard. And at site ER 413, number 10 in the table there describes population trends of indicator species for wildlife and fish. And so these are more specific guidance for the forest plan monitoring requirements. I look at that and it tells me expected precision is moderate, expected reliability is moderate, and reporting time is 3 to 5 years. What does that tell me? Yes, Your Honor. The other thing that the court needs to look at that provides more specific direction on Chapter 5 is also Appendix O. All right. And so... Is there a page site for that? At ER 422... Okay. It describes items 1D and 10. So that's referring back to the table that we just looked at. And in that section, it says that population data will be collected annually. And it describes exactly how the population data for Pileated Woodpecker, Martin, and Fishers, and Goshawks must be collected on the forest. That is something that was not done in this case. Okay. But to the extent that you have... I think what you've gotten us is, you know, the broad statement and then you're getting narrower and narrower how it's explained as to what's been done. And I'm still maybe left confused about how reading all that tells me that there should be project-level monitoring. Yes, Your Honor. What am I missing in the documents we've just read together? And I would also refer you to answer that question to ER 409 and 410, which is Chapter 5 of the Forest Plan. And that provides two pages of discussion on how the site-specific analyses are mechanisms for implementing these standards and monitoring provisions. And maybe you can point me to what you're looking at. Yeah, what language are you getting that out of? It's just that we're talking on the same page. This is the section that discusses validation of the Forest Plan standards. And it has several statements on page 409 and 410 that state that on-the-ground project analyses, tests, or monitors the appropriateness of habitat assumptions and other assumptions that are made in the Forest Plan.  There are several statements to that effect in there. But the other important thing that I want to point out is that this section also discusses what the Forest Service must do if it can't meet a Forest Plan standard. And in this case, it has not met Forest Plan Standard 3 under wildlife and fish. And so at the bottom of ER 409, at the top of ER 410, it says that if the Forest Service cannot meet a particular standard or if it wishes to deviate from a standard in a site-specific project that it must amend the Forest Plan or it must amend that standard for the site-specific project. And when it does that, it needs to comply with NEPA procedures. And, Your Honors, this is an area where this case is different from the cases in Earth Island and the other cases that are in this long string of case law regarding this issue. This Forest Plan has specific monitoring requirements in the plan itself. And it details through Appendix N how those monitoring requirements are to be implemented. The Forest Service has not done that in this case. And so the way that the Forest Service should remedy that issue is by either amending its Forest Plan or amending that standard for the site-specific project. Just I want to make sure before you leave here that I understand your argument. So I've now read, I read this before and I know there's a reference to site-specific when you're having a need for amendments. But I'm still having trouble with the fundamental question about Forest Plan versus project versus site-specific in terms of mandatory. So can you tell me in plain English what the answer is and then point me to the Forest Plan where to substantiate that? Yes, Your Honor. The purpose of population trend monitoring, which is the standard that we're discussing, is to determine the effect of management activities. So that includes logging projects on management indicator species. Those species represent a whole host of other species on the forest. And so by looking at their population trends, we can figure out how those site-specific actions are impacting all of these species. We're talking about 2,500 acres on a 2 million acre forest? Yes, Your Honor. And this is also why the population trend monitoring requirement is important is because we have lots of site-specific projects of similar acreage occurring on this forest. Okay, but we're looking at this one. You wanted an injunction to stop Little Slade. Yes, Your Honor. Which is 2,500 acres. Yes, because the monitoring requirements validate any of the habitat assumptions that the Forest Service is using to implement these site-specific projects. Well, let me direct you to the language then that you pointed me to at the bottom of ER 409. At the very end of the page it says, if it is determined during forest plan implementation that the best way to meet the management area goals of the forest plan conflicts with the forest plan standard, the forest supervisor may amend that standard for that specific project. Such site-specific amendments and the rationale for the changes must conform to NEPA standards. So are you suggesting that that language is what gets us to the responsibility to monitor management indicator species at the project level? This goes back to, I think, the Court's opinion in Rittenhouse where whether it's a project-level requirement or whether it's a forest-wide standard, the standards are enforceable. And if the site-specific project, the logging project in this case, impacts that standard, so the standard is... That's not what that language says. The language says if it's first determined that the forest plan basically is not meeting the standards, then the forest supervisor can alter the requirements for a specific project. Is it your position that that's what happened here? No. They've done no amendment to the forest plan. But it's a language they don't need to unless they determine that they're not meeting forest plan. And that was just one example, Your Honor, of how the forest plan is dealing with if there is a conflict with a standard. Okay, I think you've well exceeded your time. So we'll turn to your co-counsel. And would you put eight minutes for Mr. Knutson? You've used your rebuttal time as well. Thank you. Good morning, Your Honors. I'm Guy Knutson. I'm co-counsel for appellants. I'd like to take these few minutes to say a few words on how the agencies have failed in their obligations with regards to the ESA-listed bull trout. And the first point I'd like to make is that as an initial matter, the agencies contend that there is no need to consider bull trout at the local level, rather only, in their words, throughout its range. And they're incorrect on this point. This Court has held several times in Gifford-Pinchot, Conservation Congress also, these are all cases that we've cited, that agencies are required to consider recovery as well as survival impacts for... Mr. Knutson, what do I do with the fact that because of the way that this particular timber sale was planned, buffer zones were being left along the edge of the river. And the activities of replacing culverts and so on to the extent that those might produce some silt or so on were determined to basically have almost no impact on the bull trout because of the short length of time that the water would actually be disturbed and the time of year that it would be conducted. In essence, sort of, that there was a de minimis impact on bull trout. There are a couple of answers to that, Your Honor. My first one would be that, which I hope to get to, is that the analysis that determined that so-called de minimis impact was seriously flawed and actually contradicts the agency's own... to potentially improve in the mid to long term the habitat for the bull trout. Are you taking issue with that conclusion as well? Your Honor, we don't have a way of knowing if the project could potentially improve bull trout habitat. But didn't the agency make that conclusion? They make that claim, Your Honor, yes. Then your argument goes to the short term impact, is that right? For several reasons. Do you think the agency was scientifically wrong? We do believe the agency was scientifically wrong. But even before that, we get to that point, there is a consideration that if there are fatal impacts to this imperiled population in that short term, then it really negates any possible long term impact. The Forest Service consulted with the Fish and Wildlife Service, didn't they, about the effect on bull trout? Yes. Was that, in your opinion, sufficient, insufficient? What's your take on that? In our opinion, Your Honor, that was insufficient because the basis for their analysis, which was provided to the Fish and Wildlife Service, and this goes back to Judge Tallman's question, the basis was a modeling effort, the so-called NES-SED model, which stands for Sedimentation, basically, which predicts sediment deposition into watersheds, predicted effects that completely ignored the effects of logging roads and log road hauling, which are acknowledged throughout the record historically as the primary source of sediment. But I thought the agency's response to that concern was given the minimal disruption and the buffers to protect from whatever silt would be deposited into the watershed essentially would be washed out in the next season's high water. That was one of their contentions, Your Honor, and that's not documented or scientifically validated, but it's a statement they made. But their alleged scientific rationale was this modeling study, and the modeling study... So it's your argument that the NES-SED is not the best available science? No, it's more than that, Your Honor. Our argument is that the NES-SED is specifically contradicted in the Forest Service's own documentation for use for this purpose. And nonetheless, they used it for this purpose and presented these predictions. And what do we look at to find the direct contradiction? Sure. I would look at FER 17-18 is the most on point. That's actually documentation for the NES-SED model. And if one looks at that, it's clear that the model... These are lists of uses for which the model is inappropriate. This information was directly contradicted by at that time defendants' statements to the court and unfortunately were quoted almost verbatim in the district court's decision. I guess what I don't understand, maybe it's just a lay person's ignorance, is if the purpose of the model is to measure the impact of sediment from a particular project and the Forest Service decides based on the shortness of the operation and the manner in which it's going to be carried out, where's the flaw in using the model? There are two flaws, Your Honor. First of all, this is a project that will last for 15 years. The agency, when they say short-term, they're focusing solely on in-stream activities. They're ignoring sediment from logging. Well, they're not ignoring it. I thought that was the purpose of ordering the buffer. In other words, you leave a whole bunch of trees standing along the banks in order to help shield a lot of that silt from getting into the water. Indeed, that is one potential remedial measure, Your Honor. And they did that, did they not? That's part of the operations. That's part of the operations, Your Honor. But in the context of that, they are still relying on their model to say everything we're doing in total will not significantly impact sedimentation. Where I'm having a hard time understanding your argument is just applying common sense. It seems to me that if you're not spending a lot of time, let's say, running tractors in the middle of the stream and you're doing the operation at a time of year when there aren't going to be any bull trout in the stream, and you're leaving buffers along the edge of the stream in order to protect, why are those not reasonable steps that the agency could take in order to reduce silting? Well, Your Honor, sediment gets into streams year-round from roads. It's not a short time. It's not a certain time of year. The fish may be active a certain time of year. That happens whether you're logging in the area or not. That's not true, Your Honor. It happens much more when you are hauling logs over newly constructed roads. No, no, no. I'm asking, isn't silt a problem even when we're not doing any logging? Silt is a problem here already. This is an imperiled watershed. Right. And so the NEDSED model tries to, if I understand it correctly, it tries to measure the difference between what would be normal sediment deposits versus sediments that are going to be produced by the operation. That's the claim, Your Honor, but again, it's the wrong tool. It's a screwdriver trying to hammer and nail. The agency has picked a tool which they acknowledge is invalid. Is there another model that you urge them to use instead? Your Honor, respectfully, we don't think that's the point. The point is not... Well, the question is best available science, and I'm asking you, did you provide the agency with comments that say, don't use the NEDSED, use our model. This is a better model. Or is there no such model available? Did they choose the best thing they had, even though it's not perfect? Your Honor, if a model is totally inappropriate and documented as such, I find no way that it could be considered the best available. I would refer to this... So the answer to my question is you didn't suggest any alternatives. You just criticized the model that they were using. More than criticize, Your Honor. Noted that it is completely inappropriate. All right. Thank you. Your time has expired. May it please the Court, I am David Shilton, appearing on behalf of the U.S. Forest Service, and so I'd like to turn first to the question of consistency with the forest plan. What the Forest Service found here was that this project was consistent with the plan provisions that apply at the project level for the management indicator species that the plaintiffs are concerned about, the goshawk, the fisher, and the pileated woodpecker. Those are species associated with old growth type forest. And it found that because the project complies with the specific standards of Appendix N. Now, counsel here has pointed to two provisions in the forest management direction provision of the plan. These are at ER 405 and 406. Neither of these say anything about project specific application. The number three talks about monitor population levels of all management indicator species. Number seven says provide management for minimum viable populations of old growth and snag dependent species by adhering to the standards stated in Appendix N. If you go to Appendix N, and this is at ER 418, it specifically says that the quality, amount, and distribution of existing and replacement old growth habitat as part of project planning. And that's the key here. That is the project specific requirement, and that is what the Forest Service did. It verified the quality and amount and distribution of the existing and replacement old growth habitat. It found that this area was meeting the overall 10% standard and also the standard that for each old growth analysis area there be at least 5% old growth plus 5% replacement old growth. And that is not in question. The plaintiffs have not questioned compliance with that project specific standard. So it was on that basis that the Forest Service determined that it was in compliance with the plan, that it was consistent with the plan. And this the Forest Service interpretation of its own forest plan and whether it is being consistent is entitled to deference. So to put it in layman's terms, are you saying that the Forest Service as part of the operational plan directed that a certain amount of old growth timber be left in order to provide sufficient habitat for the indicator species? Correct. It determined when it wrote the plan that the way to continue viability for these species was to make sure there was enough old growth habitat. And so the Forest Service here determined we won't enter any old growth. We'll leave it alone entirely. So they took no old growth at all? That's correct. In the alternatives considered, they were considering taking a bit of it, but at the end of the day decided they would not take any of the old growth. So they stayed out of the old growth. The plaintiff's complaint is that some of the non-old growth could be used for nesting or foraging habitat. So there is a loss of a small percentage of potential nesting or foraging habitat. But as the Forest Service found, that's not likely to have any significant adverse effect on these species, and there's nothing in the Forest Plan that says that they cannot do that. There was no... going back to... Ms. Johnson's pointed us to various parts of the plan, and I think it was under implementation, which says if there is a conflict, then of course you can do site-specific amendments, etc. And you're saying the Forest Service determines there is no conflict? So, end of story, is that basically your argument? That's correct. Yeah, the Forest Service decided there was no conflict, so there was no need to amend the plan here, because the project-specific requirement was to preserve a certain amount of old growth, and they complied with that. Now, the plaintiffs have focused on monitoring requirements, but those are forest-wide. And it's correct that the monitoring that this somewhat ambitious forest plan sets out. It has continued to monitor, but it hasn't done all the monitoring evaluation reports that it did up until 2004. That's what the plaintiffs have focused on. But these are not project-specific requirements. There's nothing in the plan that says you cannot do a project unless you have done every single evaluation monitoring report. I believe it was opposing counsel in response to my question indicated that the plaintiffs disagree with the Forest Service conclusion that if the project is completed, at least in the medium to long term, it will actually improve the habitat for the management indicator species. And I think the response to my question of counsel was, well, the Forest Service is just wrong. We disagree with that conclusion. What do we look at in the record to find substantial evidence to support that conclusion? So the Forest Service here did find that over the long term, the project will result in a healthier mix of species, of tree species. The situation, as set out in the record, is that you have a lot of lodgepole pine that's gotten old. It's subject to beetle disease. It's very dense. And it is very at high risk of fire. So the idea is to replace that with stands of ponderosa and western larch, which are better for wildlife and more fire resistant. So it's a tradeoff between a short term loss of a bit of habitat for the longer term benefit of a But, you know, the Forest Plan itself doesn't really speak to that issue. I think that's more of a NEPA issue. But I assume that there must have been some wildlife biologist or somebody who makes that conclusion. Or is it just the Forest Service supervisor's conclusion? The Forest Service when it writes the EIS, which is where you find these conclusions, they have an interdisciplinary team, including wildlife biologists. So you can't see from the EIS itself which specialist contributed to which part. It's just the agency work product basically. But they do rely on the work of those specialists and they do cite a lot of studies, in particular we've pointed to the Samson studies in 2006 which talk about the management indicator species remaining viable because the studies show that leaving this amount of old growth forest is adequate to keep these species viable. So the Samson studies are in the record there. So just to sum up on the Forest Plan issue, I think this court's cases make clear that the key question is, what are the project specific requirements? And here the record shows that the Forest Plan did comply with those. With regard to the bull trout issues, I want to just first disagree with the statement that the Forest Service and the Fish and Wildlife Service didn't consider local populations. I think the confusion is here that the Fish and Wildlife Service points out that in order to make a jeopardy finding, it has to consider the species as a whole. But that doesn't mean that it didn't look at the local as well as the regional situation with regard to bull trout. So it looked at the Slate Creek. There are three creeks in the area that have bull trout. Looked at their situation, the current habitat conditions and so forth. That was part of the consideration. So that was considered here. Then with respect to predicting the impacts of sedimentation, the but for somewhat limited purposes. That's a model which is used to compare alternatives when you're talking about a proposal to do timbering and road building, which is a big part of this project, but not all of the project. And the Forest Service used it to compare the various action alternatives with the no action alternative. And it found that over time, all of the action alternatives would actually result in a smaller sediment yield than no action alternative. Because that's the purpose of this project basically is to eliminate a lot of the old roads that cross streams and were improperly constructed in the first place so that they're directing sediment into the streams, replace inadequate culverts and that sort of thing. So that was the purpose of using the model. It just gives you a sediment yield. And the Forest Service recognized as with most most models, it's not as fine grained as it's not going to tell you what logging trucks as opposed to bulldozers are going to do sediment wise. It's just not that fine grained. I'm trying to understand the how far you can go with the model though, because the correlation between sediment and the fish is not rocket science that there is negative impact. And then you have this model which really looks at the short term. So it seemed to me a lot of what the Forest Service was relying on was, well, we have this short term issue potentially, but of course long term things will turn out fine and in fact even better. What's the basis for that prediction when the model is, as you acknowledge, pretty limited? Well, the model, while it's limited in some ways, it does consider long term impacts. It goes out to eight years. And so it shows you at the end of eight years if you do the action alternatives, you'll have less sediment than if you did nothing at all. So it does consider a fair span of time. But the other things that the Forest Service and Fish and Wildlife Service considered were the buffers. And the old projects in these areas, which have caused a problem, were not done with these large buffers, but with something called the Pack Fish amendments in 1995, you started to have this requirement that you've got to have a 300 foot buffer for any fish bearing stream and 150 foot buffer for any non-fish bearing stream that's a perennial stream. And so when you have those and you keep the harvesting and roads out of those areas, it adds a large degree of protection. So that's sort of the combination, I think, of the model and the Forest Service's experience in this area and these buffers and best management practices for the way it replaces culverts and for the way it re-meanders a stream led it to recently conclude that the long term effect will be positive on sediment and fish in the area. The Forest Service relied in part in terms of impact on the bull trout, on the fish and wildlife bio study, correct? That's correct. Were there public hearings about this proposed project? There were on the environmental impact statement there was a draft EIS that submitted for hearing or not, but it was the plaintiffs and others commented on the EIS. The biological opinion typically there's not that sort of public process, but a lot of that information that the Fish and Wildlife Service used was information from the Forest Service that was in the draft EIS, so they would have had a... Was the fish and wildlife biop provided to the public before your client reached its decision? That I don't know the answer to. The answer is no, isn't it? They sometimes are, sometimes aren't. I'm not aware that it was in this case. Well, let's assume that it was not. That does deprive the public of an opportunity to comment, doesn't it? Well, they did have the opportunity to comment on the draft EIS. Which did not include as an attachment the Fish and Wildlife Service biop, right? That's correct. But there's nothing in the Endangered Species Act which is what imposes the biop requirement that requires a hearing or similar public process on that. Basically it's an opportunity for the expert agency to offer its opinion to the action agency here, the Forest Service, on whether there'll be jeopardy and adverse modification. It's very much a scientific process. So the public basically participates in the action agency's process by commenting on the draft EIS. So did the Fish and Wildlife Service biop exist prior to the time that the Forest Service made its determination? Yes, yes. May I conclude from that that they decided the public didn't need to see the biop? Well, I think they concluded that they had met all of their legal requirements without having a public process on the biological opinion itself. The Endangered Species Act sets out timing requirements for biological opinions and they're pretty restrictive. And I don't think in many cases would allow a public hearing sort of process. I don't think Congress contemplated that that would be happening for biological opinions. But later on the Forest Service said the biop is part of the reason this is all reasonable. Yes. Now the plaintiffs did have an opportunity to appeal the ultimate Forest Service decision through the Forest Service appellate process. So they did have that opportunity to raise concerns there. But there was no hearing on the biological opinion itself. Let me ask you about another area on the bull trout that's somewhat troubling and that has to do with the cumulative impact or cumulative effects analysis. It seems a little bit like a fly by, you know, very cursory comment on that for the mining and all kinds of other impacts that were laid out. So what standard do we judge that against given the nature of this cumulative effects analysis for the bull trout? How does it meet that standard? So the cumulative effects analysis, this is really I think a NEPA question. NEPA requires this and the question is did the Forest Service take a hard look at it? It did, not only in specifically looking at bull trout, but in looking at the sedimentation issue generally. It looked at the effects of past activities in the area recognizing that past timbering in the days when standards were much looser and mining, there was a fair amount of plaster mining in this area, had contributed to a situation where the cobble embeddedness which is basically sediment that's stuck in the cobbles is a problem in the area and the Forest Service found that this project, which should lead to improvements in cobble embeddedness is not going to lead to cumulatively more significant adverse impacts. It's actually going to improve things. So I think it did take the reasonable hard look at it. So basically a conclusory statement is sufficient on the cumulative effects in your view? Well I wouldn't view this as a conclusory because they did look at these various sources. So this court's opinions have found that the Forest Service can consider cumulative impacts in a way that they don't have to consider every specific prior timber sale. They don't have to catalog that. The Forest Service can look at the current situation with the sediment, with the cobble embeddedness and say this is the result of cumulative impacts. There is no allegation here that there are other projects in this area that are being planned that will have impacts on these creeks. So it's really just a question of whether there was an adequate hard look taken at the prior actions. And I think it was by saying as a result of all of these prior activities, here is the situation that we're dealing with. And it's likely to be improved somewhat by these various actions which decommissional roads and take away roads that are going into the stream. So unless there are other questions... Nope, it appears not. Thank you. Thank you. I'd like to thank all counsel this morning. The case just argued, Alliance v. Brazil is submitted. Thank you and we're adjourned for the morning.
judges: Hawkins, McKeown, Tallman